**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

**UNITED STATES OF AMERICA,**

          **Plaintiff,**

**v.**                                                           **Case No. 2:14-cr-20302**

**LORENZO HOWARD,**

          **Defendant.**

**REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO SUPPRESS**

Before the Court is Defendant Lorenzo Howard's Motion to Suppress. (Docket Entry "D.E." #22). The instant motion was referred to the Magistrate Judge for Report and Recommendation. (D.E. #24). For the reasons set forth herein, it is recommended that Defendant's Motion to Suppress be DENIED.

**I. Proposed Findings of Fact**

A hearing on Defendant's Motion was held on July 24, 2015. Testifying for the United States were Officers Jodi Ledford and Sammie Wicks. Testifying for the Defendant were Willie Mae Williams (as to standing) and Jeremiah King. The undersigned found the witnesses to be generally credible and from their testimony and exhibits makes the following proposed factual findings:

On July 29, 2014 at approximately 6:00 p.m., the Memphis Police Department ("MPD") received a call stating that a "male black" with "long dreads" and a "blue shirt" was "waiving a gun

1

at residents" inside an apartment complex located on North Decatur in Memphis, Tennessee and "threatening people" while children and other individuals were outside. (July 24, 2015 Hearing Transcript ("Tr.") at 13-15, 30, 33, 41).

Officer Jodi Ledford ("Officer Ledford"), a patrol officer with MPD, "went and searched the area" with her partners Officer Sammie Wicks ("Officer Wicks") and Officer Chris Houston ("Officer Houston") but was "unable to locate the suspect." (Tr. at 14, 21, 33, 35). MPD then received a second call "that was the same as the first." (Tr. at 14). Officer Ledford "went back into the apartment complex" but again did not locate the suspect. (Tr. at 14, 21). However, "several residents were pointing southwest from that location advising the suspect went that way," including Valerie Thomas ("Thomas"). (Tr. at 15).

Officer Ledford recalls that Thomas reported on the scene that "there was a male black, long dreads, blue shirt, waiving a gun, making threats against residents of the apartment complex, and that there were several children in the area while he was doing this." (Tr. at 15, 26). However, she also recalls that Thomas said that the individual with the gun was "showing it off to people in the parking lot" and that "[s]he was saying that the altercation was over somebody else who lived in the apartment complex that he was into it with" and that "he did not live there." (Tr. at 30). She further recalls that Thomas did not complain that the gun was pointed at her but was complaining because "her family had children over, and there were several juveniles" when the incident occurred. (Tr. 28-29). Although Thomas complained to Officer Ledford at the scene, Officer Ledford did not know who placed either call to MPD. (Tr. at 26-27).

Officer Ledford proceeded southwest in the direction in which the residents were pointing and "located a subject matching the description of the suspect near Looney and Hastings," which

2

was only a "block, block and a half" from the apartment complex. (Tr. at 15-16, 21). Officer Ledford, who was approximately ten feet from the suspect, observed a bulged in the waistband of his jeans that he was holding on to," which she believed from her experience was "[p]ossibly a gun, possibly just a bulge." (Tr. at 17, 21-22).

Officer Ledford "immediately got on the radio with dispatch advising that [she] would be checking one agitator at Looney and Hastings" and that she had "located the subject." (Tr. at 16-17, 34, 42). Officer Ledford "[y]elled out the window, told him to stop, come here, [that she] need[ed] to talk to him." (Tr. at 17). Officer Ledford stated that she yelled loudly and that it was apparent that the suspect heard her. (Tr. at 17). As Officer Ledford "[p]ut the radio back on the rack," the "suspect began to run north from that location . . . [b]ack towards the apartments [and] . . . towards Looney." (Tr. at 17). Officer Ledford observed that the suspect also "continued to hold onto the bulge on his waistband." (Tr. at 17).

By the time Officer Ledford turned her squad car around, the suspect "was at the end of the block and began cutting through a vacant field," still in the direction of the apartments where the initial complaints occurred. (Tr. at 17-18). Officer Ledford followed him in her squad car until she reached the "eastern boarder of that vacant lot" where the "apartment complex and a tree line" are located. (Tr. at 18). Once she reached that location, she exited her vehicle and pursued the suspect on foot. (Tr. at 18). The suspect "cut a corner in the apartment complex," at which point Officer Ledford lost sight of him. (Tr. at 18).

While Officer Ledford was pursuing the suspect, Officer Wicks heard her radio transmission, proceeded to the apartment complex, and observed the suspect "running through the apartment complex as [he] was pulling into it." (Tr. at 19, 34, 42, 46, 49, 52). Officer Wicks saw the suspect

3

run "into an apartment unit," exited his vehicle, went up to the apartment, and encountered a teenager between the ages of twelve and fifteen years old cooking inside the apartment. (Tr. at 34-35, 48). Officer Ledford saw Officer Wicks "running into Apartment Number 5 advising the suspect had went in there," and she followed him inside. (Tr. at 19, 27). Officer Wicks then observed the suspect from outside of the apartment through the open door "go to . . .a chair with a cushion on it and . . .put a handgun under the cushion and then run to the back of the house." (Tr. at 35, 49). He did not "go in immediately after him." (Tr. at 49). As Officer Ledford was entering Apartment 5 into the kitchen, Officer Wicks yelled, "gun," at which point they "backed out more towards the doorway to regroup and wait on backup to get there." (Tr. at 19, 27, 49). Officer Ledford did not observe the gun from her vantage point at that time. (Tr. at 27).

Within approximately twenty to thirty seconds, Officer Houston arrived on the scene and proceeded into Apartment 5 with Officer Ledford and Officer Wicks. (Tr. at 20, 28). Officer Wicks and Officer Houston "took the young lady out of the kitchen," "went through the living room and apprehended the suspect in the back bedroom to the left," and "cleared the apartment." (Tr. at 20, 35-36, 50). After the suspect, later identified as Defendant, was arrested, Officer Ledford recalls that she "went to the back bedroom to search for the gun" while Officer Houston and Officer Wicks "searched the living room." (Tr. at 21). Officer Ledford recalls that, within approximately "half a minute, . . . they yelled out that they had found the gun in the living room." (Tr. at 21). Officer Wicks did not recall Officer Ledford remaining in the back room looking for the gun or twenty to thirty seconds transpiring before it was found. (Tr. at 50). Ultimately, Defendant was taken into custody and the weapon was retrieved. (Tr. at 35). No further search of the premises was conducted at that time. (Tr. at 35).

4

While Defendant was in custody, Officer Wicks testified that a woman who identified herself as the leaseholder, whose name he recalled to be "Willie Mae," arrived on the scene. (Tr. at 36, 50, 52).[1] Officer Wicks stated that the leaseholder advised that she identified herself as Defendant's "auntie" but was not biologically related to him. (Tr. at 41). Officer Wicks stated that the leaseholder further advised that Defendant "wasn't supposed to be in the apartment" and that she "didn't know that he was." (Tr. at 40, 51). Officer Wicks informed the leaseholder that Defendant "forced entry into the apartment," that he observed "the door get pushed in" and what appeared to be damage to it, and inquired as to whether she considered there to be any damage and if the damage was "new or was it old." (Tr. at 40-41, 51-52). Officer Wicks inquired as to whether the leaseholder wished to prosecute Defendant for burglary, which she declined. (Tr. at 41).

Willie Mae Williams ("Williams") testified that she lived at 755 North Decatur, Apartment Five on July 29, 2014. (Tr. at 7-8). Williams testified that Defendant is her nephew and that she has know him all or most of his life. (Tr. at 7). Williams testified that Defendant is welcome to visit her, LaTaonya Williams, and Shaqueter Williams at the apartment, that he "was free to come and go as he pleased in [her] home," and that he does so "when he's around." (Tr. at 8-10). Williams testified that she was not at the apartment on July 29, 2014 when Defendant was arrested or while police officers were on the scene because she was "at the hospital during that time." (Tr. at 9, 11-12). Williams does not recall how long she was at the hospital or when she returned home on that

---

[1] At the hearing, Officer Wicks did not have his glasses to aid in identifying the leaseholder in the courtroom. (Tr. at 37-39). He initially described her as wearing a "white T shirt" in the very back of the courtroom and bending her head over. (Tr. at 37). After walking closer, he described her as the "young lady back here with the white shirt on with the blue print across it" with her "arms crossed." (Tr. at 37). He the described her as sitting in the "third row" wearing "either brown or gold stripes" that were "horizontal and the shoulders are vertical." (Tr. at 37, 39). The undersigned does not find the identification to be reliable.

5

date. (Tr. at 12). Williams stated that she was informed of Defendant's arrest from her children and that she did not know if they had been present at the time of his arrest. (Tr. at 11). Williams testified that she does not recall having any conversation with any police officer in which she advised that Defendant was not supposed to be at her apartment because she was not on the scene. (Tr. at 12). Officer Houston prepared the Record of Arrest and Officer Wicks prepared the Affidavit of Complaint charging Defendant with Evading Arrest, Unlawful Carrying or Possession of a Weapon, and Theft of Property under $500 in violation of Tennessee law. (Exhs. 2 & 3). Defendant was not charged with additional offenses, such as Reckless Endangerment or Aggravated Assault, because while "[e]verybody wanted to complain," "[n]obody wanted to come forward as a victim." (Tr. at 28-29, 41). The Affidavit of Complaint and the Record of Arrest state that this second call was made by Thomas and that she advised that "a suspect matching the same description had a pistol and was showing it off to people in the parking lot." (Tr. at 31-32 & Exhs. 2 & 3). The Affidavit of Complaint and Record of Arrest state that Officer Ledford "made the scene first and observed a male matching the description sitting in front of apartment 5" and approached him to talk before he ran. (Tr. at 46-47 & Exhs. 2 & 3). Neither the Affidavit of Complaint nor the Record of Arrest reference either Officer Ledford viewing a bulge in Defendant's pants when she approached him or the presence of the young female at the apartment. (Tr. at 23, 48 & Exhs. 2 & 3). Likewise, neither the Affidavit of Complaint nor the Record of Arrest mention that Williams advised that Defendant was not supposed to be at her apartment, which Officer Wicks explains was because they "didn't charge him with burglary or anything like that." (Tr. at 51).

Additionally, a Background Event Chronology was prepared by the MPD Communications Department. (Tr. at 54-56). Jeremiah King ("King"), MPD Communications Supervisor, testified

as to the Background Event Chronology prepared in relation to this incident. (Tr. at 54-59). The Background Event Chronology reflects that an officer with IBM number 12587 reported arrival on the scene at 17:31, that the suspect was reported as located in Apartment Five at 17:59:35, and that Officer Wicks with IBM number 12614 reported his arrival on the scene at 18:00:34. (Tr. at 57-59 & Exh. 4). Officer Wicks testified that an officer's arrival on the scene is not always reported immediately because it "depends on what is happening in real-time because sometimes if a situation is happening really fast, you don't immediately advise that you're on the scene." (Tr. at 64). The Background Event Chronology does not include an entry of when the officers located the firearm, which Officer Wicks testified is "[n]ot necessarily" the type of event that would be advised over the radio. (Tr. at 64).

## II. Proposed Analysis

### A. Standing

The first issue presented is whether Defendant has standing to assert his Fourth Amendment rights as to the search of the apartment and the seizure of his person. The Fourth Amendment states "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. In order to establish standing to invoke the Fourth Amendment, which is necessary to challenge a search or seizure, Defendant "must satisfy a two-part test: 1) whether he manifested a subjective expectation of privacy in the object of the challenged search; and 2) whether society is prepared to recognize that expectation as legitimate." *California v. Ciraolo*, 476 U.S. 207, 211 (1986). Defendant bears the burden of demonstrating that he had a legitimate expectation of privacy in the place that was

searched. *United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008) (citing *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001)).

Not all expectations of privacy will be considered legitimate for purposes of Fourth Amendment protection: "[l]egitimation of expectation of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *United States v. Pollard*, 215 F.3d 643, 650 n. 2 (6th Cir. 2000) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 n. 12 (1978)).

While "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted," *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978), "a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place," *Rakas*, 439 U.S. at 142. Still, "[i]t is well established that a defendant who was arrested in a third party's home and who is challenging the search of that home generally will not have standing to challenge the search." *United States v. Ellis*, 125 Fed.Appx. 691, 695 (2005) (citing *United States v. Buckner*, 717 F.2d 297, 299–300 (6th Cir. 1983)).

Thus, in *Jones v. United States*, the Supreme Court permitted the defendant to challenge the finding of probable cause for the search of a friend's apartment when the defendant had a key given to him along with permission to use the apartment by the owner, spent a night in the apartment, and had some personal belongings in the apartment. 362 U.S. 257, 259–68 (1960). Another example is *Minnesota v. Olson*, where the Court held that an overnight guest can have a legitimate expectation of privacy in his host's home. 495 U.S. 91, 98–99 (1990).

In determining the circumstances that entitle a guest to a legitimate expectation of privacy the following factors are illustrative. First, the amount of time that the defendant spent at the searched location before the search and second, the relationship between the guest and the owner. *See Minnesota v. Carter*, 525 U.S. 83, 90–91 (1998). When both factors are lacking the Sixth Circuit has denied standing, stating that "a casual, transient visitor does not have a reasonable expectation of privacy in his host's home." *United States v. Berryhill*, 352 F.3d 315, 317 (6th Cir. 2003) (quoting *United States v. McNeal*, 955 F.2d 1067, 1070 (6th Cir. 1992)). But a relationship between the defendant and his host, without more, is insufficient for standing. *See United States v. Buckner*, 717 F.2d 297, 300 (6th Cir. 1983) (no expectation of privacy in mother's apartment).

Thus, in *Carter*, the Court held that the defendants, baggers of cocaine in an apartment leased by a co-conspirator, did not have a legitimate expectation of privacy because defendants came to the apartment for the limited purpose of packaging cocaine, had never been to the apartment before, and only spent approximately 2.5 hours there. *Carter*, 525 U.S. at 90–91. In contrast, the Sixth Circuit found that the standing requirement was met in *United States v. Ellis* because the searched location—the house of the defendant's daughter—was one of two places that the defendant stayed and because he spent a few nights there before the search. 125 Fed.Appx. 691, 696 (6th Cir. 2005). Likewise, in *United States v. Pollard*, the Sixth Circuit found that the standing requirement was met for one defendant, Pollard, because he had been friends with the lessee of the searched location for approximately seven years, stayed at the searched location earlier in the week, occasionally spent the night at the searched location, and kept some personal belongings there. 215 F.3d 643, 648 (6th Cir. 2001).

The next factor for consideration is whether the defendant intended to stay at the apartment overnight. *See United States v. Berryhill*, 352 F.3d 315, 317 (6th Cir. 2003); *see also United States v. Pollard*, 215 F.3d 643, 648 (6th Cir. 2000) (relying upon fact that one of the defendants, Rodriguez, did not bring personal possessions and planned to leave quickly to find that standing was not met). Thus, in *Berryhill*, the Sixth Circuit denied standing based upon the district court's finding that the defendant did not intend to stay overnight: the defendant did not possess any of the items that would be expected of an overnight guest—"[h]e carried no clothes or toothbrush; indeed, the only bag in his possession contained materials for manufacturing methamphetamines." *Berryhill*, 352 F.3d at 317. Similarly, in *United States v. McNeal*, the Court held that the defendant, a guest, lacked a legitimate expectation of privacy in his host's residence because the defendant had no personal effects in the premises and stated, at the time of his arrest, that "[the host] has nothing to do with this. I don't stay here. I just stopped to use the telephone." 955 F.2d 1067, 1069–70 (6th Cir. 1992).

The final factor is whether the Defendant had the right to exclude others or evidence manifesting an intent to exercise this right. *See United States v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988). Thus, in *Sangineto-Miranda*, the Sixth Circuit found that one defendant, Nelson, was not an overnight guest by relying, in part, upon the fact that the defendant did not present evidence showing that he had a right to exclude others from the apartment and because the defendant did not show that he took precautions to insure his privacy in any area of the apartment. *Id.* But in the same case the Sixth Circuit found that a different defendant, Betts, met his burden of establishing a legitimate expectation of privacy, in part, because he had his own key, was afforded unrestricted access, and locked the door from the inside on the date of his arrest. *Id.*

In the instant case, as to the amount of time Defendant spent at Williams' apartment, the record only reflects that he would visit "when he's around." There is no indication of how often Defendant visited or how much time overall he had spent there. As to his relationship with Williams, the record reflects that they had known each other most or all of Defendants' life and that he referred to her as "auntie" although they were not related. As to whether Defendant stayed overnight at Williams' apartment, there is no reference in the record that he did so. As to whether he had the right to exclude others or evidence exists manifesting an intent to exercise this right, there is no evidence in the record that Defendant had such a right, including no evidence that he had a key. On the contrary, Defendant forced entry into the apartment on the date of his arrest, and Officer Wicks recalls that the person identifying herself as the leaseholder advised that Defendant was not supposed to be at the apartment at that time. Ultimately, the record demonstrates that Defendant was merely "a casual, transient visitor" who does not have a reasonable expectation of privacy in his host's home. Accordingly, it is recommended that Defendant does not have standing to challenge the search of Williams' apartment and that Defendant's Motion to Suppress should be denied for lack of standing.

**B. Search and Seizure**

The second issue presented is whether the search of the apartment, during which the gun was retrieved and Defendant was seized and arrested, was constitutionally permissible. With respect to seizures of property and of persons, "the Fourth Amendment has drawn a firm line at the entrance to the house," and absent exigent circumstances, that threshold may not reasonably be crossed without a warrant. *United States v. Williams*, 574 F. Supp. 2d 530, 539 (W.D. Pa. 2008) (citing *Payton v. New York*, 445 U.S. 573, 590 (1980)). The relevant inquiry is a matter of determining

whether "the facts are such that an objectively reasonable officer confronted with the same circumstances could reasonably believe that exigent circumstances existed." *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996)).

The exigent circumstances exception supporting a warrantless entry has generally been recognized in four circumstances: (1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) prevention of a suspect's escape; and, (4) risk of danger to the police and others. *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir. 1996). The United States Supreme Court has further held that "a suspect may not defeat an arrest that has been set in motion in a public place . . . by retreating to a private place." *United States v. Santana*, 427 U.S. 37, 42-43 (1976).

In the instant case, with respect to whether the warrantless entry was permissible as a hot pursuit of a fleeing felon, the offense of Evading Arrest is a Class A misdemeanor. Tenn. Code Ann. § 39-16-603(a)(3). The offense of Theft of Property Under $500 is a Class A misdemeanor. Tenn. Code Ann. § 39-14-105(a)(1). The offense of Unlawful Carrying or Possession of a Weapon is also a Class A, B, or C misdemeanor unless the person has a prior felony conviction or other circumstances apply. Tenn. Code Ann. § 39-17-1307(a)(2) & (b)(2)-(3). Although it was eventually determined that Defendant had a prior felony conviction, which gave rise to the charge of a violation of 18 U.S.C. Section 922(g)(1), the record does not reflect that any of the officers knew this information as they pursued him to effectuate the arrest.

In *Welsh v. Wisconsin*, 466 U.S. 740 (1984), the Supreme Court considered whether the Fourth Amendment permits warrantless in-home arrests for "minor offenses," including misdemeanors, under the hot-pursuit exception. "The Court stopped short of holding that a misdemeanor offense can never justify a warrantless entry under the 'hot pursuit' exception, but it

'note[d] that it is difficult to conceive of a warrantless home arrest that would not be unreasonable under the Fourth Amendment when the underlying offense is extremely minor." *Smith v. City of Sturgis*, No. 1:11-CV-390, 2012 WL 3010939, at *7 (W.D.Mich. July 23, 2012) (citing *Welsh*, 466 U.S. at 753). While *Welsh* involved a warrantless entry following a pursuit for a "nonjailable traffic offense," various United States Courts of Appeals, including the Sixth Circuit, have concluded that the exigencies of any misdemeanor arrest rarely justify a warrantless entry into a home. *Smith*, 2012 WL 3010939, at *8 (citing *United States v. Johnson*, 106 F. App'x 363, 367 (6th Cir. 2004) (reasoning that, even though the hot-pursuit exception is not foreclosed in cases involving misdemeanors, officers must identify a circumstance, apart from probable cause for the underlying misdemeanor, that "could overcome the strong presumption" that the entry into the home was unreasonable); *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 956 (9th Cir. 2000) ("[T]he Supreme Court has explained that a misdemeanor will seldom, if ever, justify a warrantless entry into the home."); *Clark v. Henniger*, No. 99-3071, 2000 WL 968044, at *4 (7th Cir. July 11, 2000) ("More troublesome here is that the arrest involved the warrantless entry into a home for misdemeanor charges, and the Supreme Court's decision in *Welsh* casts considerable doubt on the reasonableness of such an entry.").

Likewise, in this case, while the offense complained of would have been considerably more concerning than the traffic offense at issue in *Welsh*, there are no additional exigencies apart from probable cause existing to arrest him for these misdemeanor offenses that would permit warrantless entry into the apartment. Accordingly, the Court recommends that the warrantless entry into Apartment 5 to effectuate a misdemeanor arrest is not justified under the hot-pursuit exception.

With respect to the imminent destruction of evidence, there is no indication that there was such an immediate threat. As an initial matter, when Defendant ran into Apartment 5, he was observed attempting to hide the firearm under a seat cushion and retreating further into the bedroom rather than trying to destroy it. Further, "a handgun is not disposed of as easily as narcotics or other contraband." *United States v. Saari*, 88 F. Supp. 2d 835, 848 (W.D.Tenn. 1999). Only if the evidence "would probably be destroyed within the time necessary to obtain a search warrant" is a warrantless entry justified by exigency, which the record in this case does not support. Accordingly, the Court recommends that the entry into Apartment 5 was not justified based upon imminent destruction of evidence.

With respect to the risk of danger to the police and others, it is certainly true that "[p]olice officers face special threats from perpetrators who may possess, or obtain access to, firearms . . . due to the dangers posed to the police by the presence of firearms." *United States v. Wyche*, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004). Even so, "the mere presence of firearms in a house does not, in and of itself, create an exigent circumstance justifying a warrantless search" because "there must be some 'impending threat to the police or to the public.'" *United States v. Tatman*, 615 F. Supp. 2d 664, 679 (S.D. Ohio 2008):

> The presence of a weapon creates an exigent circumstance, provided the government is able to prove they possessed information that the suspect was armed and likely to use a weapon or become violent. Evidence that firearms are within a residence, by itself, is not sufficient to create an exigency to officers when executing a warrant. However, threats to an officer's safety, a criminal record reflecting violent tendencies, or a verified reputation of a suspect's violent nature can be enough to provide law enforcement officers with justification . . . .

*Id*. (citing *United States v. Bates*, 84 F.3d 1996)).

In the instant case, officers were certainly presented with more than the mere presence of a firearm. They were presented with a suspect who was observed brandishing the firearm in a public area near residents and children and making threats. They were also presented with a suspect who had fled from officers attempting to apprehend him while holding onto a bulge under his clothing. However, while these reports were undoubtedly quite concerning, there were no explicit threats to the safety of the officers, and they had no knowledge of any violent criminal record, violent tendencies, or verified reputation of any violent nature of the suspect. Further, and most notably, as the officers were entering the apartment, Defendant sought to hide the weapon and retreat rather than threaten or engage in violence. The apartment door remained open and the weapon remained stashed under a seat cushion as officers exited the apartment, regrouped, and then reentered. Thus, while the situation certainly merited swift investigation and considerable caution, it cannot be said that it rose to the level of an imminent threat to the police or others. Thus, it is recommended that the warrantless entry into Apartment 5 cannot be justified due to any immediate risk of danger to the police or others.

With respect to the prevention of the suspect's escape, while he did flee from officers attempting to arrest him, at the point that he was confined in the apartment, the record does not reflect that warrantless entry into Apartment 5 was necessary to insure that he did not further escape. Namely, the record does not reflect that the two and ultimately three officers on the scene would not be able to monitor the exits to the apartment while a warrant was obtained. *See United States v. Boffman*, 747 F. Supp. 1251, 1255 (S.D. Ohio 1990). Accordingly, it is recommended that the warrantless entry into Apartment 5 cannot be justified to prevent the suspect's escape.

However, while the entry into the apartment was not justified by these traditional exigencies, Defendant's arrest was set in motion in a public place and would have been effected in a public place had Defendant not fled across an open field, through a public parking lot, and into the private apartment. Because Defendant may not retreat into a private place to defeat an arrest pursuant to *Santana*, it is ultimately recommended that the arrest of Defendant and the recovery of the weapon in Apartment 5 is constitutionally permissible and that Defendant's Motion to Suppress be denied, in the alternative, on this ground.

### III. Conclusion

For the reasons set forth herein, it is recommended that Defendant's Motion to Suppress be DENIED.

**DATED** this 19th day of August, 2015.

s/ Charmiane G. Claxton  
CHARMIANE G. CLAXTON  
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**